# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | Case No. 1:05 cr 0558 |
| | : | |
| **Plaintiff,** | : | **JUDGE KATHLEEN O'MALLEY** |
| | : | |
| v. | : | |
| | : | |
| **EDUARDO VELASQUEZ,** | : | **ORDER** |
| | : | |
| **Defendant.** | : | |

This matter arises on Defendant Eduardo Velasquez's *Motion to Suppress Evidence* (Doc. 18), in which he requests that the Court suppress all evidence seized from his apartment on October 20, 2005. In sum, the Defendant argues that the seizure of that evidence was fatally flawed because police officers initially entered the apartment without a warrant and later entered pursuant to an invalid warrant. The government opposed the motion (Doc. 21) and the Defendant replied (Doc. 24). Following its receipt and review of the parties' papers, the Court conducted a hearing on May 9, 2006, at which the Court received testimony from three witnesses. The Court permitted the parties, if they wished, to file post-hearing briefs. Neither the government nor the Defendant filed a post-hearing brief. Accordingly, this matter is now ripe for resolution.[1]

Based on the Court's careful consideration of the parties' filings and the live testimony presented at the hearing, the Defendant's *Motion to Suppress Evidence* (Doc. 18) is **DENIED**. Given the issues presented, the Court further outlines below the basis for its decision.

---

[1] The record in this matter formally closed on June 7, 2006 when the official transcript of the suppression hearing was filed. *See* Doc. 34.

**I.     FACTUAL BACKGROUND**

Three witnesses testified at the May 9, 2006 hearing: <u>Detective John Pitts</u> (Cleveland Police Department), <u>Arleshia Williams</u> (the Defendant's former neighbor) and <u>Carlos Guelen</u> (the Defendant's half-brother). In so far as the testimony of Ms. Williams and Mr. Guelen relates solely to their observations of the events at the Defendant's residence on the night in question, the few factual disputes that exist are limited to events at the Defendant's residence after his arrest.

On October 20, 2005, officers of the Cleveland Police Department arrested an unidentified individual in connection with various drug offenses. On that same day, that individual agreed to become a confidential informant ("CI") and told the officers that he knew of someone who sells cocaine. Though the officers had never dealt with this CI before, they agreed to hear him out and attempt to set up a drug transaction. The CI claimed that he could purchase two (2) ounces of cocaine from an individual known only as "Cali." The CI told the officers where Cali lived and that he had been to Cali's residence in the past. He provided them with a description of Cali and Cali's car (a green "Lincoln"). He also claimed to have Cali's phone number. Thereafter, the CI directed the officers to an apartment located at 3143 West 56th Street, Cleveland Ohio (the "apartment"), where the officers observed a green Lincoln matching the CI's description of Cali's car.

At that point, about 6:20 p.m., Detective John Pitts began surveillance at the apartment while other officers left the area with the CI. Two simultaneous investigations then began. The first involved taped phone conversations between the CI and Cali, the purpose of which was to set up a drug transaction. The second involved Detective Pitts' observational activities at the apartment. As to the phone investigation, the following series of brief conversations took place between the CI and Cali starting at around 6:30

2

p.m.:[2]

**First Conversation**[3]

| | | |
|---|---|---|
| Cali: | Yow. | |
| CI: | What's up, Cali? | |
| Cali: | My good friend, I'm on my way back right now. | |
| CI: | Hey, uh, I got, I got a sale for 2 of em. Should, uh-- | |
| Cali: | Shit, I should be, I should be there in about 15-20 minutes. | |
| CI: | I'm on 65th and Lawn (sounds like Larn). | |
| Cali: | As soon as I'm close I'm gonna call, you on 65th, alright? | |
| CI: | One. | |
| Cali: | Alright | |

**Second Conversation**[4]

| | | |
|---|---|---|
| Cali: | Yow. | |
| CI: | _____. It is the commercial shit or the, um, good shit? | |
| Cali: | The commercial. | |
| CI: | Alright, so, you know what. | |
| Cali: | You let 'em know ahead of time, you hear me. | |
| CI: | Yeah, yeah, so bring, bring _____. | |
| Cali: | This all, I gotta stop at my friend's house first. | |
| CI: | Alright. | |
| Cali: | One. | |
| CI: | Alright. | |

---

[2] Though the parties disagree as to the meaning of certain portions of these conversations – which is the principle basis for the Defendant's argument that the warrant affidavit did not support issuance of a search warrant – they agree that these transcriptions are accurate.

Detective Pitts testified that he, and the other officers, believe these conversations involved Cali agreeing to sell two (2) ounces of cocaine to the CI. The Defendant, however, maintains that the conversations are vague and do not clearly indicate that a drug transaction was discussed. As the Court noted at the hearing, the Court reaches its own conclusions regarding the import of the statements and the strength of the affidavit based on the totality of the evidence.

[3] *See* Defendant's Exhibit A-1

[4] See Defendant's Exhibit A-2.

**Third Conversation**[5]

| | |
|---|---|
| Cali: | Yow |
| CI: | Man. |
| Cali: | I'm at my friend's house right now. |
| CI: | Huh. |
| Cali: | I said I'm at my friend's house right now. |
| CI: | Good man.  I'm not gonna wait all day. |
| Cali: | _____ 65th and what? |
| CI: | Lawn. |
| Cali: | Lawn. |
| CI: | 65th over by the store. |
| Cali: | _____ 65th and Lawn. |
| CI: | Yea, hurry up man.  I need some money too.  How much are you gonna charge?  How much you gonna charge? |
| Cali: | I'll hollar at you when I get over there. |
| CI: | Alright.  Alright. |

**Fourth Conversation**[6]

| | |
|---|---|
| CI: | Hello. |
| Cali: | Tone |
| CI: | Yea. |
| Cali: | Where you at? |
| CI: | I'm on 65th and Lorain at the _____. |
| Cali: | 65th and Lorain?  Alright.  You gonna see me pulling on in a Lincoln. |
| Cali: | Alright. |
| CI: | One. |

**Fifth Conversation**[7]

| | |
|---|---|
| Cali: | Yow. |
| CI: | Yo, I'm on Lawn though on 65th and Lorain.  It the _____ store. |
| Cali: | Shit, I don't even know where that's at, but I know where 65th and Lorain at.  I don't know. |
| CI: | Look, when you get to 65th and Lorain make a right.  Once you do you gonna see a store.  I'll be right there. |
| Cali: | Alright. |

---

[5]  See Defendant's Exhibit A-3.

[6]  See Defendant's Exhibit A-4.

[7]  See Defendant's Exhibit A-5.

4

Detective Pitts testified that he observed the Defendant – who matched the CI's description of "Cali" – exit the apartment at around 7:00 p.m and deposit two trash bags on the tree lawn. Shortly thereafter, according to Detective Pitts, the Defendant left the premises in the Lincoln the CI previously identified as Cali's car. However, Arleshia Williams testified that, while trash bags were out on the tree lawn that night (Thursday, October 20, 2005), she believed they were put there the day before (Wednesday, October 19, 2005). Though she was less than clear with regard to the level of her attention and the time frame during which she observed the Defendant's front yard and tree lawn, Ms. Williams testified that she did not see the Defendant place anything on the tree lawn on the evening of October 20, 2005.

When the Defendant left the apartment, Detective Scott Moran followed him to an area near 65th and Lawn. When the Defendant reached that area, the CI identified him as Cali. The CI further identified him as the person who lived at the apartment and had promised (over the phone) to bring two (2) ounces of cocaine. After the CI's identification, the Defendant was stopped and arrested for offering to sell two (2) ounces of cocaine.

Following the arrest, the officers recovered a cell phone from the Defendant. The phone's number matched the number used by the CI during the recorded conversations. While no drugs were recovered, a drug-sniffing dog alerted to the presence of drugs in the Defendant's car (the Lincoln). All of this information was communicated to Detective Pitts who had remained at the apartment.

At that point, Detective Pitts testified that he went to the tree lawn and searched the trash bags that he had seen the Defendant deposit there earlier. In the trash bags, he found mail bearing the Defendant's name and the apartment's address. He also recovered corner-ripped plastic bags which, based on his experience as a vice detective, he testified were "drug packing materials." He also recovered

a plastic bag with suspected cocaine residue in it.[8] Detective Pitts testified that, after recovering this evidence, he decided to pursue a search warrant for the Defendant's apartment.

Detective Pitts then notified (over the radio) the arresting officers of his discoveries and the officers responded to the apartment. While en route, the officers informed Detective Pitts that the Defendant denied living at the apartment and claimed that his aunt lived there. Based on that information, Detective Pitts testified that he became wary that someone else might be in the apartment while "here [he] was digging through the trash on the tree lawn." He indicated concern that someone might be in the house and, having been alerted by his presence on the tree lawn, be in the process of destroying evidence of drug activity or be capable of doing so prior to the securing of a search warrant.

When the officers arrived, Detective Pitts advised them that he wanted to "secure" the premises so as to make sure no one was in the apartment destroying evidence. At that point, he and one or more officers entered the apartment and performed a "protective sweep" to search for other people who might be inside. Detective Pitts testified that they entered through the side door, which was unlocked.[9] During the sweep, which he testified lasted only a "few minutes," Detective Pitts observed various drug-related items (*e.g.*, a "kilo press" and straight razor blades). Finding nobody in the apartment, the officers exited

---

[8] The plastic bag field-tested positive for cocaine residue. While it is unclear when Detective Pitts performed the field test in relation to the protective sweep that would follow his discoveries, he testified that his experience and training led him to believe – even before the test was performed – that the residue on the bag was cocaine residue. Based on his affidavit, he clearly performed the test prior to securing the warrant.

[9] Carlos Guelen testified that he had been to his half-brother's apartment more than twenty times and always knew the Defendant to lock the door. Mr. Guelen did not testify, however, that he knew the side door to the apartment was locked on the night in question. Arleshia Williams testified, moreover, that she watched the officers enter the home and that she did not observe them "pushing" or "forcing" the door open.

6

and Detective Pitts left the scene to secure a search warrant. The other officers remained at the apartment with the Defendant under arrest and seated in the back of one of the police cruisers.

Arleshia Williams confirmed the officers' pre-warrant entry into the apartment, though she believed the officers were in the apartment for approximately twenty minutes and did not believe that Detective Pitts participated in the initial sweep. Ms. Williams indicated that she heard various officers on the street discussing the fact that they were awaiting a search warrant for the premises.

After conferring with Detective Mendoza, who had overseen the phone investigation and listened to the conversations between the CI and Cali, Detective Pitts typed a warrant affidavit[10] and a search warrant[11] to present to a judge for signature. Detective Pitts testified that he did not listen to the recorded conversations prior to drafting the affidavit and warrant; rather, he relied on Detective Mendoza's description of the conversations. He testified, however, that the representations in his affidavit are accurate and representative of the recorded conversations, which he subsequently reviewed. He claims that, though it is not contained in his affidavit, he orally informed the judge that a drug-sniffing dog had alerted to the presence of drugs in the Defendant's car, but that the officers on the scene had found none in the vehicle. Detective Pitts testified that he <u>did not</u> inform the judge that officers had entered the apartment to perform a protective sweep or that he had observed drug-related items in the apartment during that sweep. Thereafter, the judge issued the warrant to search the Defendant's house.

Detective Pitts then informed the officers at the apartment that a warrant had been secured. The officers subsequently searched the Defendant's apartment and recovered a large amount of powder cocaine, $30,000 in cash, a Tech-9 semi-automatic firearm, razor blades, a kilo-press, drug-packing

---

[10] *See* Defendant's Exhibit C-2.

[11] *See* Defendant's Exhibit C-1.

materials, men's clothing and a cell phone (different than the one used in the recorded conversations). That cell phone contained digital pictures of the Defendant.

I.  **DISCUSSION**[12]

The Defendant requests that all evidence seized from his apartment on October 20, 2005 be suppressed. In support of that request, the Defendant presents two arguments.

First, the Defendant argues that the police illegally entered his apartment without a search warrant prior to any *reasonable belief* that drug activity was afoot or that evidence of such activity might be found in the apartment <u>and</u> prior to *deciding* to pursue a search warrant. He also suggests that information gleaned during the initial entry was used to obtain the search warrant, thereby corrupting it. Ultimately, he argues that the initial warrantless entry violated his Fourth Amendment rights and invalidated the subsequent warrant search.

In response, the government argues that the initial entry into the apartment did not automatically render the later search invalid. The government argues that the Supreme Court has authorized "protective sweeps" under appropriate circumstances. Despite the government's concession that the sweep in this case was technically improper, it argues that, because the officers (1) *reasonably interpreted* the recorded

---

[12] The Defendant's motion presented typical suppression issues as well as a *Franks* issue with regard to Detective Pitts' affidavit. Specifically, the Defendant asserted that Detective Pitts knowingly withheld material information from the judge who issued the search warrant (*i.e.*, the fact of the warrantless entry into the apartment) and intentionally mischaracterized the content of the telephone conversations between the CI and the Defendant. The government objected to the Court conducting a *Franks* hearing because it believed that the Defendant had not made the "substantial" preliminary showing required by *Franks* with regard to what the affiant did in this case. For the reasons outlined by the Court on the record at the hearing, the Court afforded the Defendant a fair amount of flexibility to inquire into the facts and circumstances leading up to the issuance of the search warrant in this case. As noted at the hearing, the Court determined on a question by question basis whether the Defendant went too far with respect to his *Franks* inquiries.

8

phone conversations to mean that a drug transaction had been arranged, (2) *decided* to pursue the warrant *prior to* conducting the sweep, and (2) *did not disclose* to the issuing judge any information gleaned from the sweep, the warrant is valid. The Defendant's reply is only that the timing of the officer's decision to pursue a warrant and whether they used anything gleaned from the sweep are contested facts.[13] He does not, however, cite authority for the proposition that a protective sweep – improper or otherwise – automatically invalidates a subsequent warrant search.

Second, the Defendant directly challenges the validity of the search warrant. He argues that its supporting affidavit is filled with inaccuracies and exaggerations and that, absent those deficiencies, the issuing judge never would have signed the search warrant because she would have concluded that no probable cause existed.

In response, the government argues that under the "totality of the circumstances," probable cause existed and the warrant is valid. First, the government argues that the evidence obtained from the "trash pull" *alone* established probable cause. Second, the government argues that, in addition to the trash pull evidence, the *unrebutted* statements in the warrant affidavit (*i.e.*, the Defendant has only provided argument as to interpretation) are accurate and certainly establish probable cause for the warrant. Further, the government highlights that the Defendant's challenge to the warrant affidavit, to the extent it is based on the view the affidavit contains misstatements and/or omissions, faces a heavy burden. It argues that the Defendant must demonstrate a "deliberate falsehood" or "reckless disregard for the truth" by the affiant. The government argues that the Defendant's challenge is woefully deficient in this regard and is supported only by speculation and not evidence.

---

[13]  Obviously, having had a hearing, the Court will assess the credibility of the witnesses and resolve the "contested facts," if any, suggested by the Defendant.

**A.     The Protective Sweep**

A threshold inquiry is whether the protective sweep, if improper, automatically invalidates the subsequent warrant search of the Defendant's apartment. In support of his view that the protective sweep was a bald violation of the his Fourth Amendment rights, the Defendant cites no legal authority for the proposition that such searches are <u>always</u> improper, or that, if improperly performed, they taint subsequent independent warrant searches of the same premises. Instead, the Defendant simply argues that a warrantless sweep occurred and, therefore, evidence later seized during a warrant search must be suppressed. The Defendant presented no evidence to rebut Detective Pitts' testimony that any information gleaned during the sweep <u>was not included</u> in the warrant affidavit or otherwise communicated to the judge who issued the warrant.

It is well-settled that warrantless "protective sweeps" are permitted under certain circumstances and do not necessarily run afoul of the Fourth Amendment. *Maryland v. Buie*, 494 U.S. 325 (1990). Such searches are permitted to allow law enforcement briefly to determine whether a danger exists within a residence. To justify such a search, however, officers must "have a reasonable belief based on specific and articulable facts that someone who posed a danger to the officers was in the house." *United States v. Brown*, 217 F.3d 605 (8th Cir. 2000). Despite the Defendant's statement that his aunt lived at the apartment, the government concedes that the protective sweep was not supported by the requisite "specific" and "articulable" facts regarding the presence of a danger to officer safety. In fact, Detective Pitts testified that his primary concern was with the possible destruction of evidence by individuals who might be present in the apartment. Accordingly, the government concedes that the sweep was technically improper. Because the later warrant search was sufficiently independent from the sweep, however, the evidence seized during that later search is not affected by this flaw.

10

The Supreme Court addressed this very issue in *Sagura v. United States*, 468 U.S. 796, 797 (1984), and stated that whether the initial protective sweep was illegal or not is irrelevant to the admissibility of evidence that is seized later pursuant to an independently acquired warrant. Much like the manner by which the warrant was secured in *Sagura*, Detective Pitts obtained the warrant in this case with information wholly independent from the protective sweep.[14] He testified that, having observed drug-related items in the Defendant's curb-side trash and been informed that the Defendant was engaged in a suspected drug transaction, he decided to seek a search warrant. He further testified that none of the observations from the protective sweep were communicated to the judge who issued the warrant.

As such, the protective sweep in this case – though technically improper (by concession) – did not necessarily invalidate the subsequent warrant search as the Defendant argues. That search must rise or fall on its own merit, independent of the sweep.

### B.    Probable Cause and the Search Warrant

In determining whether to issue a warrant, a judicial officer is to consider the evidence in light of the "totality of the circumstances" and make a "practical, common sense decision whether, given the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons suppling hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983). The duty of a reviewing court is to ensure that the issuing judicial officer had a "substantial basis for . . . conclud[ing]" that probable cause existed. *Jones v. United States*, 362 U.S. 257, 271 (1960).

In resolving the probable cause issue presented in this case, the Court is faced with two inquiries:

---

[14]   Whether that information was accurate or otherwise amounted to probable cause is irrelevant to the Court's present consideration, which relates solely to whether the information was "independent." The Court considers the accuracy issue *infra*.

11

(1) did the evidence seized from the "trash pull" alone establish probable cause; and (2) if not, did probable cause exist based on all the evidence presented to the issuing judge? Necessarily, the latter inquiry – if reached – requires consideration of the Defendant's challenges to the warrant affidavit's accuracy, and the separate burden arising under *Franks v. Delaware*, 438 U.S. 154 (1978).

### 1. Trash-Pull Evidence

Assuming *arguendo* that the Defendant's general attacks on the portions of the affidavit describing the recorded telephone conversations are well taken, the warrant in this case could nevertheless be upheld if the Court determines that the evidence seized from the Defendant's trash alone established probable cause. Under the circumstances of this case, where a tip from the CI prompted surveillance of the Defendant's apartment, the Court finds that probable cause existed based on the trash-pull evidence alone – though the Court acknowledges that this is a close call.[15]

One of the few contested facts in this case relates to whether the Defendant placed the trash bags in question on the tree lawn before leaving the apartment on October 20, 2005 or at some prior time. Detective Pitts testified that he observed the Defendant place the bags on the tree lawn shortly before leaving the apartment. Arleshia Williams, however, testified that trash bags were set out the day before – on October 19th – and that she did not see the Defendant put anything on the tree lawn on the night he was arrested.[16] She also testified that she saw an officer go through the trash on October 20, 2005; but

---

[15] The Defendant does not challenge the legitimacy of trash-pull evidence generally. It is well-settled that an individual has no reasonable expectation of privacy in garbage that has been left on the curb for collection. *California v. Greenwood*, 486 U.S. 35 (1988). The Defendant only challenges the sufficiency of the evidence for purposes of establishing probable cause.

[16] Ms. Williams did not specifically testify whether the bags she had seen on the tree lawn the night before were the very bags searched by the police, though she clearly implied it.

12

that the officer was not Detective Pitts.

While it is likely that the Court's conclusion would be the same under either version of these facts, the Court found Detective Pitts' testimony to be more credible on these points and accepts his testimony that he searched trash bags that the Defendant deposited on the tree lawn on October 20, 2005 shortly before leaving the apartment. Detective Pitts was certain as to what he saw; indeed, his express purpose in being at the apartment that night was to conduct surveillance on the apartment. Conversely, Ms. Williams testified that she was on her porch socializing with her neighbor, which suggests that her attention likely was not trained on the events at her neighbor's house. When recounting what she observed, at times she seemed unsure. Indeed, she did not believe that Detective Pitts participated in either the trash pull or the protective sweep, both of which the Court finds to have occurred. Ms. Williams' demeanor left the Court with the impression that her recollection of the events – which occurred over seven months ago – while well meaning, was not accurate.[17]

Regardless of which version of the facts is true, however, the trash contained mail bearing the Defendant's name and the address of the apartment. Accordingly, if Ms. Williams' version is true, the only material change would be that the trash would have been placed on the tree lawn twenty-four hours earlier. Though the Defendant cites *United States v. Harris*, 6 Fed. Appx. 304 (6th Cir. 2001), a case that addresses the effect of "stale" evidence on a probable cause determination, he does not do so in support of the proposition that the trash evidence in this case was stale. Rather, he cites *Harris* for the proposition that the evidence found in the trash (corner-torn plastic bags and cocaine residue) is insufficient to establish probable cause because that case makes a passing reference to the lower court's conclusion that

---

[17] While the Court questions the accuracy of Ms. Williams' recollection, it did not form the impression she was lying or intentionally trying to mislead the Court.

13

"one stem of marijuana" *likely* would not establish probable cause.

Courts routinely address whether evidence seized from the trash suffices to establish probable cause. As evidenced from the varying findings on this issue, each case presents circumstances that inform a court's decision, even though a court may be focusing only on the evidence from the trash. For example, the government cites *United States v. Briscoe*, 317 F.3d 906 (6th Cir. 2003), where the Sixth Circuit determined that the discovery of forty marijuana seeds and twenty-five marijuana stems in the defendant's trash nine weeks after the police received a tip established probable cause. In response, the Defendant cites *United States v. Harris*, 6 Fed. Appx. 304 (6th Cir. 2001), which directly addressed only the effect of "staleness" on the sufficiency of evidence. The Defendant, however, seizes upon the Court's reference to the district court's finding that "the presence of the *[single]* marijuana stem alone was *probably* insufficient to establish probable cause." *Id*. at 307 (emphasis added). Suffice it to say, these two cases present different factual scenarios and likely appear at the outer ends of the trash-pull evidence spectrum.

In this case, law enforcement received a tip that the Defendant was engaged in drug activity in his apartment. Though that information came from an informant who had never been used before, which the government concedes, the officers took steps to corroborate the material aspects of the information provided. In the process of corroborating the CI's claims, among other things, Detective Pitts staked-out the Defendant's apartment and observed the Defendant, who met the CI's description of his drug contact "Cali," place trash (taken from inside the apartment) on the tree lawn before departing in a vehicle, which matched the CI's description of "Cali's" car. The contents of the trash suggested two things: (1) both the trash and the apartment was the Defendant's, as evidenced by the mail bearing his name and the apartment's address; and (2) drug activity was ongoing in the apartment, as evidence by the torn plastic

baggies (one of which contained cocaine residue) often used for packaging drugs.

Unlike *Harris*, which only <u>suggests</u> that a single marijuana stem found in the trash may not suffice to establish probable cause of drug use, Detective Pitts, who is an experienced vice-detective, found what he suspected were drug packing materials and drug residue after having been told that drug activity had taken place in the Defendant's apartment. His discovery reasonably led him to believe not only that drug use was ongoing in the house, but that drug trafficking likely was ongoing as well. Further, despite the logic underlying the limitation *Harris* suggests, courts regularly find that even minimal evidence of drug activity recovered from a suspect's trash significantly contributes to a finding of probable cause. *See e.g.*, *United States v. Reinholz*, 245 F.3d 765, 776 (8th Cir. 2001) (brass pipe with cocaine residue and twenty syringes found in trash coupled with the occupant's prior drug conviction established probable cause); *United States v. Gonzales-Rodriguez*, 239 F.3d 948, 950-51) (8th Cir. 2001) (crack pipe, baggies and foil with methamphetamine residue found in trash, coupled with informant's tip, established probable cause); *United States v. Hohn*, 8 F.3d 1301, 1302 (8th Cir. 1993) (baggie and sno-seals with methamphetamine residue found in trash, coupled with informant's tip, established probable cause).

Accordingly, though the Court acknowledges that it is a close call, the Court finds that the evidence seized from the Defendant's trash, after receipt of a tip regarding drug activity at the apartment, established probable cause for a warrant in this case. As such, the Defendant's arguments relative to the other evidence outlined in the warrant affidavit effectively are moot. The Court finds them unavailing, in any event. Nevertheless, it briefly addresses them below.

### 2. *The Warrant Affidavit*

The Defendant's primary argument is that the police manufactured an affidavit reflecting that credible evidence of drug activity had been lawfully discovered. He argues that an untested – and,

15

therefore, unreliable – CI provided vague information to the police and that the police, having recorded several phone conversations between the CI and the Defendant, misrepresented the substance of those conversations to convince a judge that a drug deal had been arranged. The Defendant argues that the fact no drugs were recovered on his person or in his car when he was arrested highlights that the officers' interpretation of the information they had prior to his arrest was unreasonable. The Defendant does not argue that he was not one of the individuals on the recordings (*i.e.*, "Cali"). The thrust of Defendant's argument, therefore, is that Detective Pitts made intentional misstatements in his affidavit.

Such a challenge faces a heavy burden. *See United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). As outlined in *Franks v. Delaware*, 438 U.S. 154, 171-72 (1978), there is a "presumption of validity with respect to [an] affidavit" and a challenge to the affiant's statements must rise to the level of a "deliberate falsehood" or "reckless disregard for the truth." Because it is clear that the statements in the affidavit are substantially – if not completely – accurate, and there is no evidence that Detective Pitts sought intentionally to misstate the evidence that had been gathered, the Defendant's *Franks* challenge fails.

The Defendant's only support for his attack on the affidavit's statements is his contention that the transcript of the recorded conversations do not support them. He presented no external evidence (or even argument) that Detective Pitts, or any other officer, knowingly falsified the evidence. Accordingly, the Court need only make its own determination as to whether the recorded conversations reasonably support the statements in the affidavit.

Detective Pitts testified, and the Court is certainly aware, that drug dealers often speak in code, or otherwise avoid specifically mentioning drugs when arranging drug transactions – especially when doing so on the phone. To expect (and require) such explicit references, as the Defendant argues, is

16

simply unrealistic. While Detective Pitts admits that he did not hear the conversations first-hand prior to writing the affidavit, he explained that the substance of the calls had been communicated to him by another experienced officer who <u>had</u> heard the conversations first-hand. Detective Pitts further testified that, upon subsequent review of the transcripts of the conversations, and based on his many years as a vice-detective, he believes the statements in his affidavit accurately reflect what was communicated from the Defendant to the CI over the phone. The Court agrees.

It is evident from the conversations that the CI and the Defendant were at least acquaintances and had arranged to meet at a specific (and public) place to complete a transaction of some sort. As to what that transaction related, the CI stated to the Defendant that he wanted "2 of 'em" and later confirmed that what he would receive was "the commercial shit," which certainly addressed the items' quality. Having been told by the CI that he could buy two (2) ounces of cocaine from the Defendant ("Cali"), it is anything but "reckless disregard for the truth" for the officers to have concluded that the conversations related to a drug transaction for two (2) ounces of cocaine. This is true despite the fact no drugs were recovered from the Defendant or his car. Of course, the drug dog's alert on the Defendant's car certainly supports the view that drugs had been in the car at some point in the past, if not that very day.

Accordingly, the presumption as to the affidavit's validity is upheld and the only question that remains is whether the evidence presented in the affidavit actually established probable cause for the search warrant. Clearly, it did. Experienced officers received a tip that was corroborated as their investigation progressed. Taking into consideration all of the circumstances, as the Court must, it is clear that the evidence outlined in Detective Pitts' affidavit is accurate and demonstrates a fair probability that contraband or evidence of a crime would be found in the Defendant's apartment because, as Detective Pitts testified, it is reasonable to conclude that an individual involved in the drug trade likely will have evidence of his involvement in his home, particularly where, as here, evidence of drug packaging was

discarded directly from the apartment.

Accordingly, notwithstanding the Court's conclusion that the trash-pull evidence <u>alone</u> was sufficient, probable cause certainly existed in light of the totality of the evidence presented in Detective Pitts' affidavit.

### III.   CONCLUSION

For the forgoing reasons,  the Defendant's *Motion to Suppress Evidence* (Doc. 18 ) is **DENIED.**

**IT IS SO ORDERED**.

                                              s/Kathleen M. O'Malley
                                              **KATHLEEN McDONALD O'MALLEY**
                                              **UNITED STATES DISTRICT JUDGE**

**Dated: July 6, 2006**